# In the United States Court of Federal Claims

No. 14-814C

(Filed: April 28, 2016)

```
************************************* *
                                      *
VICTOR L. WADE,                       *
                                      *
                    Plaintiff,        *   Review of BCNR Administrative
                                      *   Decisions Resulting in Discharge
v.                                    *   From the Navy; Procedures of
                                      *   Administrative Separation Board;
THE UNITED STATES,                    *   Standard of Review; Available
                                      *   Remedies.
                    Defendant.        *
                                      *
************************************* *
```

*William E. Cassara*, Evans, Georgia, for Plaintiff.

*Daniel S. Herzfeld*, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Steven J. Gillingham*, Assistant Director, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., *Jonathan B. Blazek*, Department of the Navy, Of Counsel, for Defendant.

OPINION AND ORDER

WHEELER, Judge.

      Plaintiff, Victor L. Wade, commenced this action on September 4, 2014 requesting the Court to review the Department of the Navy's administrative punishment of him following a positive cocaine test from a urine sample taken on June 27, 2007. Among other things, after a February 8, 2008 hearing, the Navy's Administrative Separation Board ruled that Petty Officer Wade should be discharged from the Navy after 19 years, 6 months, and 22 days of service. The effect of this ruling was to bar Mr. Wade from receiving his pension and other benefits for which he would have been eligible after 20 years of military service. Based upon a "no tolerance" drug policy, the Navy gave little weight to Mr. Wade's superlative military career, or to the evidence suggesting that Mr. Wade may not have knowingly ingested cocaine as alleged. The case is before the Court to review the Navy's

717-page administrative record, and the parties' cross-motions for judgment on the administrative record.

This case regrettably has dragged on far longer than it should have. There have been multiple administrative reviews in this case at the Board for Correction of Naval Records ("BCNR"), each time resulting in a denial of Mr. Wade's appeal. After Mr. Wade filed his lawsuit in this Court, there was a remand to the BCNR to allow for additional administrative review, which also was denied. A detailed statement of the facts and the history of proceedings follows below.

Factual Background[1]

Victor L. Wade enlisted in the Navy on March 23, 1989 at age 19. AR 5, 21. The Navy trained Mr. Wade as an Information Systems Technician. AR 22. In a variety of naval assignments, many of them overseas, Mr. Wade served for more than 18 years in exemplary fashion without any disciplinary incidents. AR 2, 111. On June 27, 2007, Mr. Wade underwent a random urinalysis test at Fort Gordon in Augusta, Georgia. AR 89-93. On July 5 and 9, 2007, at the Navy's Jacksonville, Florida Screening Laboratory, Mr. Wade's urine sample tested positive for cocaine in a concentration of 482 ng/mL, which exceeded a Department of Defense limit of 100 ng/mL. AR 114.

On July 13, 2007, the Navy informed Mr. Wade that he was suspected of violating Uniform Code of Military Justice (UCMJ) Article 112a, for wrongful use of cocaine. AR 103-04. On July 26, 2007, after consulting by telephone with a military lawyer, Mr. Wade elected to accept potential non-judicial punishment instead of proceeding to a court martial. AR 98-102. In signing a form, Mr. Wade acknowledged that "acceptance of non-judicial punishment does not preclude further administrative action against me. This may include being processed for an administrative discharge, which could result in an other than honorable discharge." AR 101-02.

On August 8, 2007, Mr. Wade appeared in person before his commanding officer regarding non-judicial punishment, and he pled not guilty. AR 95-96, 107, 111. Based solely on the positive urinalysis test, the commanding officer determined that Mr. Wade had committed the offense of wrongful use of a controlled substance and imposed non-judicial punishment resulting in reduction in rank to paygrade E-5, restriction to Fort Gordon for a period of 45 days, and forfeiture of pay totaling $1,291.00 per month for two months. AR 96, 108-09, 110, 260-61. On August 17, 2007, Mr. Wade appealed the non-judicial punishment to the Commander, Navy Region Southeast. AR 107-09, 110-12. On

---

[1] The facts in this decision are taken from the administrative record. The pages in the administrative record are numbered in sequence. The Court's citations to the administrative record are to the AR page numbers.

September 21, 2007, without any analysis or discussion, the Commander denied Mr. Wade's appeal. AR 106.

On October 15, 2007, the Navy notified Mr. Wade that it was initiating separation proceedings that could result in discharge from the Navy. AR 74-75. Mr. Wade exercised his right to appear before an administrative separation board and to be represented by counsel. Id.

The Navy retains specimens reported as positive in frozen storage for one year after the initial testing. AR 114. The purpose of retaining the urine sample is to permit retesting "for any reason." AR 45. "We would not destroy a sample until legal matters have been resolved." Id. The retention period may be extended upon written request. Id. In January and February 2008, before the separation board's hearing, the Navy denied the request of Mr. Wade's counsel to have his specimen retested by an independent laboratory. AR 240, 244-45. The Navy also denied counsel's request for DNA testing of Mr. Wade's urine sample. AR 246.

On February 8, 2008, the Administrative Separation Board convened a hearing at Fort Gordon, Georgia before a three-person panel consisting of LCDR Chris Storey, Senior Board Member, LT Ken Moates, Member, and CTNCM Brian Wenrich, Member. AR 26.[2]

The Navy's case against Mr. Wade consisted of proving that the urinalysis test results from the June 27, 2007 sample were accurate. See AR 30-46. The Navy presented the testimony of the observer for the urinalysis test (AR 30-31), the coordinator for the urinalysis test (AR 31-33), and the chemist from the Navy's drug laboratory in Jacksonville, Florida (AR 34-46). During the course of this testimony, the observer acknowledged that "I don't recall exactly what happened six months ago, I'm giving a general prospective [sic] of what we normally do." AR 31. The coordinator stated that Mr. Wade had taken other random urinalyses, and that "[n]one of them had been positive." AR 33. The Navy attempted to establish that the positive urinalysis tests were accurate, but did not present any evidence showing how Mr. Wade may have ingested a controlled substance. Mr. Wade's counsel argued that the Navy's case was deficient because, even if

---

[2] From the standpoint of performing judicial review, the record of the hearing before the Administrative Separation Board (AR 26-72) is the most important document in the administrative record. Unfortunately, the record is seriously flawed. Although the proceedings were tape-recorded, and seemingly could have been used to produce a verbatim question and answer transcript, the record instead contains paraphrased summaries of testimony. The opening and closing statements of counsel are not included. AR 28, 71. The direct testimony of William Moye, Mr. Wade's first witness, is not included due to malfunctions of the tape-recording system. AR 47.

the urinalysis tests were accepted, there was no evidence of Mr. Wade's "wrongful ingestion" of any controlled substance.  See, e.g., AR 240.

The record supports a finding that Mr. Wade's urinalysis test reading of 482 ng/mL is relatively low.  According to the Navy's chemist, Mr. Albert Marinari, the urinalysis test cannot serve as a timeline to know when the cocaine may have been ingested, and it does not indicate how the cocaine was ingested.  AR 44.  If a small amount of cocaine had been orally ingested within 24 hours of the test, it could produce "a level like this," and "it opens up a wide range of possible scenarios."  Id.  Under these assumptions, the test could "produce this type of level" without the ingestion having caused a "stimulant or euphoric effect."  Id.  If we "get beyond the period of three or four days, it is highly unlikely that we're going to see a positive result."  Id.  Based upon an expert declaration from Dr. John Vasiliades, submitted with Mr. Wade's first request for reconsideration to the BCNR, a test result of 482 ng/mL reflects a relatively low positive indication and may suggest an unknowing ingestion of cocaine with food or drink.  See AR 460-64.

In Mr. Wade's defense, his counsel presented six character witnesses, and the testimony of Mr. Wade.  AR 46-71.  Among the noteworthy portions of Mr. Wade's case are the following:

- At the time of his hearing, Mr. Wade was married, and had two dependents.  AR 21.  One of the dependents was Mr. Wade's own daughter, and the other was his cousin-in-law.  AR 63.

- Mr. Wade adamantly denied taking any drugs.  AR 66.  When Chief Moye informed him of his positive urinalysis test, Mr. Wade was "puzzled and asked if they were kidding me."  AR 65.  He stated to a colleague, "I can't believe this, there's no way."  AR 61.  Another witness testified that "[Mr. Wade] swore up and down that he didn't do it."  AR 58.  Mr. Wade reiterated "I don't do drugs, never did," and "No, I did not take cocaine around this period of the urinalysis of June 27th."  AR 67.

- The character witnesses for Mr. Wade were shocked to hear of the positive test results.  AR 49 ("I don't know him as someone who takes drugs.  I've never seen him take drugs or do anything inappropriate with alcohol.  I am shocked that he has been accused of using cocaine.");  AR 50 ("I can say with 100% assurance that based on his character, he wouldn't do drugs.");  AR 51 ("When he called and told me about the results, it was shocking to me. . . .");  AR 55 ("I would never see him as someone who would turn to cocaine as a solution for whatever was stressing him.");  AR 57 ("I was shocked when I heard. . . . [H]e's a physical fitness fanatic.").

4

- Mr. Wade was very athletic, worked out at the gym, and was an excellent basketball player. He was physically fit, and would not do anything to harm his body. AR 49, 57, 58 ("He was in immaculate physical condition.").

- Mr. Wade was known for his integrity and high moral character. AR 49 ("He is a stellar performer and a leader."); AR 55 ("[H]e's a wonderful person.") AR 57 ("I consider him a truthful person."); AR 60 ("I do consider him a truthful and very trustworthy person.").

- In October 2006, Mr. Wade had taken a second job as a security officer at the Augusta Mall to help support his family. AR 47, 51. Ms. Barbara Henry, Assistant Public Safety Director, Valor Security Services, testified that Mr. Wade is "one of my best workers. I've never had a complaint about him. He takes initiative, he's very friendly, provides good customer service." Id.

- The mall has an accessible employee lounge where employees like Mr. Wade can store food. AR 51-52. Mr. Wade sometimes purchased a beverage at the food court and set it on a fire extinguisher or cabinet. AR 64. He would mark his drink to indicate that it belonged to him. Id. He needed to set the beverage down unattended because he could not carry it around while on duty. Id.

- Mr. Wade normally is stationed in the mall's food court area "which is considered our trouble spot." AR 52. In June 2007, on the weekend prior to his urinalysis test, there was a major event in Augusta called "The Classic" which is a football competition that brings young adults to the area to play football. Id. The event "brings in approximately ten times our normal traffic on a Friday and Saturday." Id. On the Saturday of that weekend, there was a large group of people sitting in the food court area who were "loud and unruly." Id. Some of them were young soldiers who knew that Mr. Wade also was in the military. AR 238-39. Mr. Wade had to escort out three people in this group, putting them on the ground to handcuff them because they became combative. AR 52. "They were arrested for disorderly conduct." Id. The young soldiers had both motive and opportunity to see that Mr. Wade got in as much trouble as they did with their superiors. AR 239.

- In working two jobs, Mr. Wade had little time for a social life. AR 63 ("I don't really have a social life here."). His entire day was consumed by work and sleep. AR 239. The idea that Mr. Wade would be consuming illegal drugs is highly implausible. Id.

5

On the issue of separation or retention, Mr. Wade's counsel asserted that the separation board members should have considered: (1) the seriousness of the offense; (2) the likelihood of a recurrence; (3) the member's potential for further service; and (4) the member's military record. Id. There is no evidence that the separation board members considered any of these factors. At the conclusion of the hearing, and applying a preponderance of the evidence standard, the separation board members reached a decision in only 33 minutes (16:01 to 16:34) to discharge Mr. Wade. AR 71. On September 19, 2008, the Navy issued an involuntary separation notice to Mr. Wade after 19 years, 6 months, and 22 days on active duty. AR 254.

On March 23, 2011, Mr. Wade's counsel, Mr. Charles Gittins, applied to the BCNR to correct Mr. Wade's naval record by removing his 2007 non-judicial punishment and the 2008 decision of the Administrative Separation Board. AR 397-464. On February 16, 2012, the BCNR denied Mr. Wade's application in a two-page letter. AR 362-63.

On April 1, 2014, Mr. Wade's new counsel, Mr. William Cassara, submitted a request for reconsideration to the BCNR. AR 375-82. On July 25, 2014, the BCNR denied Mr. Wade's application in a similarly brief letter. AR 359-61.

On January 15, 2015, after this case had been filed, the Court remanded the matter to the BCNR at the joint request of the parties to review exhibits from the Administrative Separation Board proceedings that likely were not reviewed by the BCNR during Mr. Wade's original petition or request for reconsideration. However, the BCNR again denied Mr. Wade any relief. AR 5-7.

Discussion

A. Subject Matter Jurisdiction

Plaintiff must establish this Court's jurisdiction over the subject matter of his claim before the Court can proceed to the merits of the claim. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89 (1998); Taylor v. United States, 303 F.3d 1357, 1359 (Fed. Cir. 2002); Anderson v. United States, 59 Fed. Cl. 451, 454-55 (2004). In this case, the Court's subject matter jurisdiction is derived from the Tucker Act, which grants jurisdiction over claims "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, does not confer any substantive rights upon Plaintiff, and thus Plaintiff must establish an independent right to money damages from a money-mandating source within a contract, regulation, statute or constitutional provision in order for the case to proceed. Jan's Helicopter Serv. Inc. v.

FAA, 525 F.3d 1299, 1306 (Fed. Cir. 2008); Volk v. United States, 111 Fed. Cl. 313, 323 (2013). Here, the separate money-mandating source is the Military Pay Act, 37 U.S.C. § 204.

B.  Standard of Review

Rule 52.1 of this Court governs motions for judgment on the administrative record. A review of this kind is like a paper trial based upon the documents assembled by the agency. The Court makes factual findings based upon the evidence presented in this record. See, e.g., Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005); Coastal Envtl. Grp., Inc. v. United States, 118 Fed. Cl. 1, 10 (2014). The existence of a fact question in the record does not preclude the granting of judgment on the administrative record, and does not require the Court to conduct an evidentiary proceeding. Rather, any fact questions must be resolved by reference to the administrative record, "as if [this Court] were conducting a trial on [that] record." Bannum, 404 F.3d at 1354. The use of Rule 52.1 to render judgment on the administrative record is appropriate in deciding challenges to military correction board decisions. Young v. United States, 497 Fed. App'x 53, 58-59 (Fed. Cir. 2012).

In reviewing the actions of a military correction board, to obtain relief, a plaintiff must show that the board's decision was arbitrary, capricious, unsupported by substantial evidence, an abuse of discretion, or contrary to law. Porter v. United States, 163 F.3d 1304, 1312 (Fed. Cir. 1998); Wronke v. Marsh, 787 F.2d 1569, 1576 (Fed. Cir. 1986); Volk, 111 Fed. Cl. at 325; Anderson v. United States, 59 Fed. Cl. 451, 455 (2004). Applying this standard, a court should not substitute its own judgment for that of the military corrections board where the decision is supported by substantial evidence, even where reasonable minds might reach a different conclusion on the same record. Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983) ("It is equally settled that responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province; and that courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence."); see also Voge v. United States, 844 F.2d 776, 782 (Fed. Cir. 1988) (stating that the "court does not function as a sort of super Correction Board"); Grieg v. United States, 640 F.2d 1261, 1268 (Ct. Cl. 1981) ("The court is not here to second-guess them.").

C.  The Merits of Mr. Wade's Case

Despite the difficult burden that Mr. Wade must meet to prevail in this case, the Court is deeply troubled by the Navy's actions in discharging Mr. Wade involuntarily after 19-1/2 years of outstanding service to his country. There are so many shortcomings and

inconsistencies in the administrative record that the Court is reluctant to let the Navy's ruling stand.

Let us begin with Mr. Wade's positive urinalysis test from a sample collected on June 27, 2007, and tested on July 5 and 9, 2007 in Jacksonville, Florida. This was the first time Mr. Wade had ever tested positive on a urine sample in 18 years in the military. Mr. Wade has a strong reputation for honesty and integrity, and he vehemently denied under oath ever taking a controlled substance. His witnesses before the separation board uniformly were shocked to hear that Mr. Wade had tested positive. When first told of the test results, Mr. Wade thought the Navy officials were teasing him. Before the collection of the urine sample on June 27, 2007, and later when he went to see his superiors to be told of the test results, Mr. Wade did not appear at all anxious or concerned.

The relatively low positive reading of 482 ng/mL is inconclusive in terms of the timing or method of ingestion, but "it opens up a wide range of possible scenarios." AR 44. The low level likely does not reflect the actions of someone trying to experience a drug's euphoric effects, but rather is more in keeping with a person's unknowing ingestion of a small amount of cocaine. A low positive reading on a first-time offense, with no evidence of how the substance was ingested, does not establish a "wrongful use," and should not warrant the severe punishment of discharge from the military.

There are a number of procedural concerns that are bothersome to the Court. From a due process standpoint, it is unknown why the Navy would not allow an independent test of Mr. Wade's urine sample, or a DNA test to make sure the sample belonged to Mr. Wade. These steps would have been relatively simple, and yet quite useful to the credibility of the Navy's administrative proceedings. The Navy's entire purpose in retaining urine samples in frozen storage for a year or more is to allow retesting, but the Navy refused further testing here. By denying these tests, the Navy has raised doubts about the fairness of the proceedings.

The flaws in the separation board's transcript add further questions to the Navy's process. With a tape recorded hearing, it is unknown why there is no verbatim transcript, why the opening and closing arguments are not included, and why William Moye's direct testimony is omitted. Even if the tape recording equipment malfunctioned during this testimony, surely the parties' counsel could have agreed on the substance of the witness's testimony so that it could have been available for later review. As it is, the Court is deprived of important aspects of the hearing. These shortcomings add further doubt to whether Mr. Wade's discharge from the Navy can be supported by the record.

A 33-minute deliberation period by the separation board's three-member panel also is disconcerting. Mr. Wade's 18-year military career was at stake, and he had presented a

compelling defense casting serious doubt on the Navy's charge of *wrongful* use of a controlled substance. Indeed, the only evidence against Mr. Wade was a urine sample that had been tested only by the Navy. There was no evidence of how Mr. Wade ingested the controlled substance. Given the importance of the proceeding to Mr. Wade, and the evidence of mitigating circumstances he presented, the three-member panel at least could have given the evidence and arguments a more rigorous review. The BCNR similarly gave Mr. Wade's case only cursory treatment.

Ultimately, the Navy's case against Mr. Wade fails because the Navy did not prove that he *knowingly* ingested cocaine. Without a *knowing* consumption of a controlled substance, the ingestion could not have been *wrongful*. See Manual for Courts-Martial, United States, Part IV, ¶ 37.c, Article 112a – Wrongful use, possession, etc., of controlled substances:

> (5) *Wrongfulness*. . . . Possession, distribution, introduction, or manufacture of a controlled substance is not wrongful if such act or acts are: . . . (C) without knowledge of the contraband nature of the substance (for example, a person who possesses cocaine, but actually believes it to be sugar, is not guilty of wrongful possession of cocaine). Possession, distribution, introduction, or manufacture of a controlled substance may be inferred to be wrongful in the absence of evidence to the contrary. The burden of going forward with evidence with respect to any such exception in any court-martial or other proceeding under the code shall be upon the person claiming its benefit. If such an issue is raised by the evidence presented, then the burden of proof is upon the United States to establish that the use, possession, distribution, manufacture, or introduction was wrongful.

See also United States v. Mance, 26 M.J. 244 (C.M.A. 1988) overruled on other grounds by United States v. Payne, 73 M.J. 19 (C.A.A.F. 2014) (use of a controlled substance is not wrongful if the element of knowledge is lacking); United States v. Crumley, 31 M.J. 21 (C.M.A. 1990) (knowledge by the accused is a necessary element of wrongful distribution). Here, Mr. Wade contested the Navy's case against him, denying any knowledge of how evidence of cocaine got into his urine sample, and the Navy failed to meet its burden of proof to show knowledge or wrongful conduct. The BCNR should have identified the "existence of probable material error or injustice," 32 C.F.R. § 723.3(e)(2), but it did not.

## Conclusion

Considering the entire administrative record, the Court vacates the Navy's administrative punishment of Mr. Wade as being arbitrary, capricious, an abuse of discretion, and not supported by substantial evidence.  In particular, his involuntary discharge from the Navy on the record presented was unjustified.  The Court directs the Navy to reinstate Mr. Wade with all appropriate back pay, benefits, and allowances, and to return to him the funds forfeited as a result of the August 8, 2007 non-judicial punishment.  Mr. Wade may apply to the Court for the reimbursement of reasonable legal fees to the extent allowed by law.  Costs are awarded to Plaintiff.

The Court GRANTS Plaintiff's cross-motion for judgment on the administrative record, and DENIES Defendant's motion for judgment on the administrative record.  The Clerk shall enter judgment for Plaintiff.  Pursuant to Rule 54(d), costs are awarded to Plaintiff.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge